# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Jeffrey A. Vance, et. al. | ) ) ) ) ) | Case No. 20-MJ-10 |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2018 through the present__ in the county of __Kenosha and Walworth__ in the __Eastern__ District of __Wisconsin__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 | Conspiracy to possess with intent to distribute and to distribute at least 50 grams of actual methamphetamine |
| 18 U.S.C. §§ 924(c) and 2 | Possession of a firearm during and in relation to a drug trafficking crime |
| 18, U.S.C. §§ 922(d) and 924(a)(2) | Providing a firearm to a felon |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Kurt Heiser, FBI Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/4/2020

*Judge's signature*

City and state: Milwaukee, Wisconsin

William E. Duffin, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# APPLICATIONS FOR A CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Kurt Heiser, being first duly sworn, hereby depose and state as follows:

## I. BACKGROUND

1. I was deputized as a Task Force Officer (TFO) with the FBI in 2019. In addition to being a TFO with the FBI, I have been employed by the Racine County Sheriff's Office since 2012. Since 2017, I have been an Investigator for the Racine County Sheriff's Office.

2. I have received training in the investigation of drug trafficking. I have worked with informants in the investigation of drug trafficking; and I have participated in the application of and execution of search warrants, narcotics investigations, and arrests in which controlled substances and drug paraphernalia were seized. Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving controlled substances, I know and have observed the following:

   a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

   b. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

   c. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

   d. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

   e. I know it is common for individuals involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money

orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control;

f. I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, and receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. It is common practice for the aforementioned books, records, receipts, notes, ledger, etc., to be maintained where the traffickers have ready access to them;

g. It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence;

h. It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices;

i. Likewise, it is common for businesses that engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or using a nominee name when performing the transaction. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment;

j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants,

casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l. I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

m. I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

n. I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices; and

o. Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities: computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

3. I am a deputized Federal Task Force Officer, with the United States Department of

Justice. As such, I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) and 21 U.S.C. § 878, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

5. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

6. Because this affidavit is submitted for the limited purpose of obtaining a criminal complaint and arrest warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause.

7. Based on the investigation to date, there is probable cause to believe that beginning in 2018 until the present, in the Eastern District of Wisconsin and elsewhere, Jeffrey A. Vance (DOB XX/XX/1964), James P. Brown (DOB XX/XX/1971), Christopher P. Townsend (DOC XX/XX/1975), and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ hereinafter collectively referred to as the "Target Subjects") knowingly conspired with each other and others known and unknown to possess with intent to distribute and to distribute controlled substances, including at least 50 grams of actual methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846. Further, there is probable cause to believe that Christopher P. Townsend and ▓▓▓▓▓▓▓▓ have possessed firearms in furtherance of drug trafficking, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2, and on or about January 10, 2020,

4

Townsend knowingly provided a firearm to a person he knew to be a felon, in violation of Title 18, United States Code, Sections 922(d) and 924(a)(2).

## II.     PROBABLE CAUSE

8.      This is a joint investigation of the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), and the Racine County Sheriff's Office into methamphetamine distribution in southeastern Wisconsin.

9.      In December of 2019, case agents interviewed a confidential human source (CHS). CHS identified Christopher P. Townsend (DOB XX/XX/1975) as a methamphetamine distributor in southeastern Wisconsin. Beginning in 2018, CHS met Townsend through a mutual friend, and CHS purchased "Molly" from Townsend. At that time, CHS was living in Wisconsin and Townsend was living in Kenosha. CHS sold Townsend gram quantities of methamphetamine, two to four times a week. Shortly after CHS met Townsend, CHS began to sell ounce quantities of methamphetamine to Townsend on a weekly basis. When CHS was out of methamphetamine, CHS would purchase ounce quantities of methamphetamine from Townsend. CHS purchased ounce quantities from Townsend on three to five occasions. CHS's understanding was that Townsend distributed the methamphetamine he purchased from CHS in Wisconsin.

10.     When CHS moved to California in September 2019, Townsend drove to California with CHS. While in California, CHS sold Townsend one pound of methamphetamine, and Townsend took the pound back to Kenosha, Wisconsin, via train. While in California, CHS continued to distribute methamphetamine to Townsend. CHS would contact Townsend and direct Townsend to pick up methamphetamine CHS sent to a third party in Milwaukee, WI. CHS contacted Townsend via phone at cellular telephone numbers 262-220-8705 and 262-977-5376.

11.     For several reasons, case agents believe that CHS is reliable and credible. First,

CHS has been providing continuous information since December of 2019. Second, the information CHS has provided is substantially against CHS's penal interest. CHS providing information and cooperating with case agents in hopes of receiving a sentencing reduction in his/her pending federal Methamphetamine distribution case. CHS has prior convictions of two counts 2nd degree robbery (2007), possession of marijuana for sale (2008), possession of marijuana for sale (2009), possession of controlled substance (2009), possession of blow gun (2009), 2 counts disorderly conduct (2009), burglary (2010), participate in criminal street gang (2011), 2 counts of Burglary (2012), felon in possession of stun gun (2014), and several probation/ parole violations. CHS has served three separate prison terms. Finally, CHS has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein, and CHS's information has been corroborated through other evidence, including recorded phone calls, law enforcement surveillance, and controlled buys. For these reasons, case agents believe CHS to be reliable.

12. On January 9, 2020, CHS was set up with a Callyo phone number to record all incoming and outgoing text messages and phone calls. CHS contacted Townsend at 262-977-5376, and Townsend told CHS he had a new telephone number: 262-220-8705. CHS asked Townsend if he had any methamphetamine, which CHS referred to as "crystal," to sell to the CHS. Townsend advised the CHS he could meet the CHS the next day, January 10, 2020, and sell him a few grams of methamphetamine and a semi-automatic handgun. CHS and Townsend agreed that CHS would pay Townsend $600: $500 for ½ ounce of methamphetamine; and $100 to Townsend for setting up the deal. They also agreed that CHS would pay Townsend an additional $300 for a HI-Point CF380, semi-automatic handgun. Townsend told CHS that he would pick up ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, bring ▬▬▬▬ to meet CHS at the Walmart in Burlington,

6

and obtain the money from CHS for the methamphetamine and HI-Point handgun. Townsend would give CHS the handgun, and then Townsend and [REDACTED] would drive to Whitewater and pick up the methamphetamine. Townsend told CHS that the methamphetamine would come from [REDACTED] source of supply (SOS) in Whitewater. [REDACTED] SOS in Whitewater was later identified as Jeffrey Vance (DOB XX/XX/1964). A query of law enforcement databases reflected that Vance resides at 612 Walworth St. Apartment #2, in Whitewater, WI. Townsend and CHS discussed that Townsend would also give [REDACTED] $50 of the $100 CHS was paying Townsend for setting up the deal. Once the methamphetamine was picked up in Whitewater, Townsend and [REDACTED] would drive back to the Burlington Walmart and give CHS the Methamphetamine. During the conversation, CHS told Townsend that CHS was a convicted felon and was unable to buy guns from gun stores. Townsend sent CHS via text message photos of the HI-Point Semi-auto gun that Townsend intended to sell to CHS.

13. On January 10, 2020, at approximately 10:40 a.m., at law enforcement direction, CHS met Townsend and [REDACTED] in the parking lot of the Burlington Walmart. Law enforcement conducted surveillance of CHS meeting with Townsend and [REDACTED] and CHS was equipped with a recording device. Townsend was driving a black Chevrolet S10, bearing WI registration PH2523 with no front plate, and a truck tool box in the rear truck bed. [REDACTED] exited the passenger's side of the vehicle and meets with CHS. Townsend was in the drives seat, and parked the vehicle in the parking lot near CHS and [REDACTED] CHS handed Townsend $900 of recorded buy money: $300 for the handgun; and $600 for the ½ ounce of methamphetamine. Townsend exited the vehicle, and opened the tool box located in the rear of the truck bed. CHS grabbed the handgun, which was wrapped in a green, micro-fiber type towel. Townsend and [REDACTED] got back into the black Chevrolet S10, and Townsend drove the vehicle away from the Walmart. Law

7

enforcement followed them to Whitewater. However, approximately two miles from Vance's residence (612 Walworth St. Apartment #2), surveillance ended because of concerns of detection in the rural area. During this time, under law enforcement direction, CHS contacted Townsend several times via phone to ask where he was and how much longer until he got back. During the wait for Townsend and ▓▓▓▓ to bring the methamphetamine back, ▓▓▓▓ contacted CHS via phone. ▓▓▓▓ used his cell phone number of ▓▓▓▓. Townsend also sent CHS via text message photos of the methamphetamine when Townsend got the methamphetamine in his hand. At approximately 1:58 p.m., Townsend and ▓▓▓▓ pulled back into the Walmart parking lot in the black Chevrolet S10. CHS made contact with Townsend at the driver's door of Townsend's vehicle. Townsend handed CHS a baggie with a clear, white, glassy substance, which later tested positive for methamphetamine, and weighed 13.9 grams.

14. Between January 10, 2020, and January 12, 2020, CHS and ▓▓▓▓ had multiple conversations on recorded phone lines about ▓▓▓▓ elling CHS heroin and guns. On January 12, 2020, ▓▓▓▓ texted CHS the following message; "Why did you tell Chris that I said to just call me I never leave him out of anything we do we're partners I just know his girls a bitch and won't let him get back to you or anyone else sometimes and we lose out on a lot of business transactions so someone needs to put them in the works but I don't backdoor anyone especially if you're my only person I can trust and believe me it's Chris." ▓▓▓▓ also told CHS that he would send CHS photos of guns he has for sale once his brother sends the guns to ▓▓▓▓ from his stash house. ▓▓▓▓ also told CHS that he has AK 47's (assault rifles) for sale with silencers.

15. On January 14, 2020, in a recorded phone call, CHS and Townsend discussed Townsend getting Vance's phone number so CHS and Townsend could go straight through Vance for pounds of methamphetamine, instead of going through ▓▓▓▓

8

16. Between January 20 and January 22, 2020, CHS and Townsend set up a deal for CHS to buy an ounce of methamphetamine from Townsend for $1000. Townsend told CHS he was getting this ounce from a SOS in Milwaukee by the name of "Rok." On January 20, 2020, Townsend sent CHS via text message Facebook profile picture for the Milwaukee SOS. Through a law enforcement database, the Milwaukee SOS was identified as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮

17. On January 22, 2020, at approximately 1:05 p.m., at law enforcement direction, CHS met with Townsend at Townsend's residence (6537 61st Avenue, Kenosha, WI). CHS entered Townsend residence and completed the controlled buy. CHS paid Townsend $1000 for 31.1 grams of methamphetamine. Townsend told CHS, ▮▮▮▮ dropped the ounce off at Townsend's residence (6537 61st Avenue, Kenosha, WI) the previous day. Townsend also told CHS that he paid ▮▮▮▮ $800 for the ounce and was only making $200 on the deal.

18. Between January 24, 2020, and January 25, 2020, Townsend and CHS set up a deal to purchase two ounces of methamphetamine from ▮▮▮▮ Their calls were recorded. Townsend told CHS that CHS could meet ▮▮▮▮ and Townsend at Townsend's address (6537 61st Avenue, Kenosha, WI), and complete the buy there. Townsend told CHS that the two ounces of methamphetamine would cost $2000. Townsend would also make a few hundred dollars off the deal through CHS. This deal fell through and never happened.

19. On January 26, 2020, at law enforcement direction, CHS contacted Townsend by phone to set up a controlled buy of methamphetamine for January 27, 2020. The call was recorded. CHS and Townsend discussed buying four ounces from Vance. Townsend stated he called ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Townsend stated "Ann" told him if Townsend gives her a few grams of methamphetamine, she would call Vance and set a deal up for January 27, 2020. Townsend

9

told CHS he would pick CHS up in Whitewater and bring CHS to meet Vance at Vance's residence (612 Walworth St. Apartment #2). Townsend discussed putting some of his own money in to also buy an ounce from Vance. CHS made a deal with Townsend that he would pay Townsend a few hundred dollars for setting up the deal. Townsend also said CHS would have to give ▅▅▅ and ▅▅▅ a hundred dollars for setting up the deal.

20. On January 27, 2020, at law enforcement direction, CHS contacted Townsend and confirmed they were on for the four-ounce methamphetamine buy with Vance. Townsend sent CHS the address of 804 Walworth Avenue in Whitewater, which is a gas station near Vance's house. Townsend told CHS he and ▅▅▅ will pick CHS up, and take CHS to Vance's residence (612 Walworth St. Apartment #2), and complete the buy there. ▅▅▅ called CHS while in Whitewater, and stated he wanted to drive around Vance's house to make sure no one else was there before they did the deal. At approximately 12:48 p.m., CHS met with Townsend and ▅▅▅ at 804 Walworth Ave (gas station) in Whitewater. ▅▅▅ told CHS he dropped ▅▅▅ off at Vance's residence (612 Walworth Avenue #2), and she is talking with Vance to discuss how much CHS needs. ▅▅▅ was driving Townsend's black Chevrolet S10, the same car Townsend drove during the January 10, 2020 controlled buy. Law enforcement conducted physical surveillance of the meeting at the gas station and CHS was equipped with a recording device.

21. ▅▅▅ and CHS left Townsend at the gas station and went to Vance's residence (612 Walworth St. #2). When ▅▅▅ and CHS entered Vance's residence (612 Walworth St. #2), Vance an ▅▅▅ were the only two people in the residence. CHS, ▅▅▅ and Vance talked in the apartment for over an hour. The meeting was audio/video recorded and law enforcement conducted physical surveillance outside Vance's apartment. During the time CHS

10

was in the apartment, "Jim" came to the apartment for a few minutes before leaving. "Jim" was later identified as James P. Brown (DOB XX/XX/1971). It was also determined that Brown's address is 612 Walworth Avenue, #10, the same apartment complex as Vance's residence.

22. While in Vance's apartment, Vance talked about his previous methamphetamine charges, arrests, and involvement in cooking methamphetamine. Vance also talked about techniques used to mask the smell of packaged methamphetamine. Vance also discussed pricing for methamphetamine with CHS, and stated each ounce would be $950. Vance talked about buying the methamphetamine for $600-$700 an ounce. Vance also discussed that he does not generally store a large amount of methamphetamine at his residence (612 Walworth St. #2) because he fears getting arrested again. Vance talked about having five previous convictions and being locked up forever if he gets arrested again.

23. Vance stated that he did not have the four ounces of methamphetamine on him at this time, but stated he would have someone drop off the methamphetamine within the next few hours. Vance stated his SOS was coming from Beloit. Vance discussed with CHS that once his SOS drops off the methamphetamine, he would contact CHS directly, and CHS could come back and pick up the methamphetamine. Prior to leaving, CHS and Vance exchanged phone numbers. Vance told CHS that he initially wanted a middleman between him and CHS, but now that Vance met CHS, he was comfortable dealing with CHS directly. Due to Vance not having the methamphetamine on him, CHS, ▓▓▓▓▓▓▓▓ rove back to the gas station and picked up Townsend. After this interaction, CHS was contacted several times by ▓▓▓▓ and Townsend asking CHS if he was still going to give them the $100 for setting up the deal with Vance. CHS told Townsend and ▓▓▓▓ he would pay them their fee for setting up the deal once he had methamphetamine in hand and the deal was successful.

11

24. On January 27, 2020, at approximately 4:29 p.m., Vance contacted CHS via phone number 608-921-9708. The call was recorded. Vance told CHS he was good, and CHS could come back to his apartment and get the methamphetamine. CHS called Vance at 608-921-9708, and Vance told CHS he had four ounces for sale. They agreed to meet at Vance's apartment (612 Walworth Avenue #2, Whitewater) at around 11:00 a.m. on January 28, 2020.

25. On January 28, 2020, at approximately 9:42 a.m., at law enforcement direction, CHS contacted Vance, who stated he still had the four ounces of methamphetamine, and confirmed the buy time of 11:00 a.m. At approximately 11:00 a.m., CHS arrived at Vance's apartment (612 Walworth Avenue #2) and met with Vance. Brown was also at Vance's apartment. The meeting was audio recorded. Vance and CHS again discussed pricing for the methamphetamine. Vance told CHS he paid $2800 for the four ounces ($700 an ounce) and was comfortable charging CHS $900 an ounce ($3600 for four ounces). After CHS and Vance confirmed the price, Vance is heard on the audio recorder asking Brown, "You want to grab that Jim?" CHS reported that Brown exited Vance's apartment and returned a short time later carrying a "Ritz" cracker box that contained the four ounces of methamphetamine. CHS further reported that the methamphetamine was in a zip-lock bag, which was inside another zip-lock bag with oil or grease in between each bag. CHS commented to Vance about the drug packaging, and Vance responded, "That's how I got it dude." Vance and CHS also discussed future purchases of pound quantities of methamphetamine, and Vance stated he was still waiting on his SOS to come through with a pound. After meeting with Vance, CHS met law enforcement at a predetermined meet location and turned over the methamphetamine, which tested positive and weighed approximately 121.3 grams.

26. During the meeting between Vance and CHS, case agents conducted physical surveillance of Vance's apartment. They observed a man, later identified as James Brown, exit

12

Vance's apartment, walk in the direction of Apartment #10 (Brown's apartment), enter an apartment in the vicinity of Apartment #10, exit the apartment with a "Ritz" crackers box in his hand, and return to Vance's apartment. Although case agents did not see which apartment Brown entered, they observed him enter an apartment that was either Apartment #8, #10, or #12, which are all adjacent to one another. Records, as identified below, reflect that James Brown lives in Apartment #10.

27. After the four-ounce methamphetamine purchase was complete, CHS contacted ▇▇▇▇ and Townsend through recorded calls and told them he was willing to pay each of them $100 for setting up the deal. At law enforcement direction, CHS met ▇▇▇▇ at his residence ▇▇▇▇▇▇▇▇▇▇ and paid him $100 of pre-recorded buy money. This meeting was audio recorded. CHS thanked ▇▇▇▇ for setting the deal up Vance. CHS told ▇▇▇▇ he would hook him up once the next deal happened, and ▇▇▇▇ stated, "Thanks bro, be safe." CHS then met Townsend at his residence (6537 61st Ave. Kenosha, WI) to pay him $100 of pre-recorded buy money. The meeting was audio recorded. CHS confirmed with Townsend that the $100 payment was for Townsend setting up the four-ounce deal with Vance.

28. During the recorded call on January 27, 2020, and the controlled buy on January 28, 2020, CHS and Vance discussed CHS purchasing one pound of methamphetamine during the week of February 3, 2020. Vance told CHS that the pound would cost approximately $5,500 and Vance would need one day lead time to get the pound of methamphetamine to his residence (612 Walworth St #2). The discussion between Vance and CHS was audio recorded on a device given to CHS by law enforcement.

III. CONCLUSION

29. Based upon the facts contained within this affidavit, I submit that there is probable

13

cause to believe that beginning in 2018 and continuing to the present, Jeffrey A. Vance (DOB XX/XX/1964), James P. Brown (DOB XX/XX/1971), Christopher P. Townsend (DOC XX/XX/1975), and ▇▇▇▇▇▇▇▇▇▇▇▇ (hereinafter collectively referred to as the "Target Subjects") knowingly conspired with each other and with others known and unknown to possess with intent to distribute and to distribute controlled substances, including at least 50 grams of actual methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846. Further, there is probable cause to believe that Christopher P. Townsend and ▇▇▇▇▇▇▇▇ have possessed firearms in furtherance of drug trafficking, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2, and on or about January 10, 2020, Christopher P. Townsend knowingly provided a firearm to a person he knew to be a felon, in violation of Title 18, United States Code, Sections 922(d) and 924(a)(2).